REDACTED

**AFFIDAVIT IN SUPPORT OF APPLICATIONS**
**FOR ISSUANCE OF SEARCH AND SEIZURE WARRANTS**

Your affiant, Jason Holsinger, being duly sworn and deposed, states as follows:

## INTRODUCTION

1.      I am a Special Agent (SA) with the United States Department of Justice, Federal Bureau of Investigation (FBI). I am currently a member of an Organized Crime Drug Enforcement Task Force (OCDETF) investigating a drug trafficking organization (DTO) led, directed and controlled from the Hampton Roads area of Virginia in the Eastern District of Virginia (EDVA) whose co-conspirators and subordinates are engaged in the distribution of kilogram quantities of cocaine and heroin within the aforementioned locality.

## SEARCH LOCATIONS

2.      Your affiant makes this affidavit in support of applications for search warrants for the following locations within the EDVA:

> a.    The residence of ELEONORA PARONUZZI and ALEX JERMAINE BURNETT, located at XXX Drivers Lane, Newport News, Virginia.

> b.    The current business of ALEX JERMAINE BURNETT and SHIRLEY DIANE BURNETT located at XXXX East Claiborne Square, Hampton, Virginia.

> c.    The residence of ROBERT LEE BURNETT, SHIRLEY DIANE BURNETT and ALEX JERMAINE BURNETT located at XXXXX Batiste Court, Carrollton, Virginia.

## ASSETS TO BE SEIZED

3.      Your affiant makes this affidavit in support of applications for seizure warrants for the following assets located within the EDVA:

> a.    2014 Nissan Altima with VIN # XXXXXXXXXXXXX3322 and Virginia registration XXX1878.

    b.   2013 Ford F-150 with VIN # XXXXXXXXXXXXXX519 and Virginia registration XXX6645.

    c.   2004 BMW Coupe with VIN # XXXXXXXXXXXXX0064 and Virginia registration XXX6130.

    d.   2004 Porsche Coupe with VIN # XXXXXXXXXXXXX0124 and Virginia registration XXX4105.

    e.   2016 Ford F-350 with VIN# XXXXXXXXXXXXX5840 and Virginia registration XXXX3125.

    f.   Kubota Diesel Tractor MDL XXXXXLB-R-1 and 54" side discharge mower attachment model XXXXX-23BX.

    g.   Old Point National Bank account # XXXXXXX5006.

    h.   SunTrust Bank account # XXXXXXXXXXX2602.

    i.   Bank of America account # XXXXXXXXX7326.

    j.   Wells Fargo account # 3150808438.

## CRIMINAL OFFENSES

4.    This request for search and seizure warrants is made in relation to the following offenses occurring in the EDVA and elsewhere:

    a.   Distribution and possession with intent to distribute controlled substances in violation of Title 21, U.S.C., § 841;

    b.   Conspiracy to distribute and possess with intent to distribute controlled substances in violation of Title 21, U.S.C., § 846;

    c.   Maintaining a place for use or distribution of controlled substances in violation of Title 21, U.S.C., § 856;

    d.   Possession of firearms by prohibited persons, in violation of Title 18, U.S.C., § 922(g);

    e.   Conspiracy to commit money laundering, in violation of Title 18, U.S.C., § 1956 (h).

## AUTHORITY FOR SEIZURE AND FORFEITURE

5.     The following statutes authorize the seizures sought here and will authorize the initiation of forfeiture proceedings with respect to the items set forth in paragraph 3 above:

    a.   Title 21, U.S.C., § 881(a)(6) authorizes the civil forfeiture of all drug proceeds and all funds used or intended to be used to facilitate a drug offense;

    b.   Title 21, U.S.C., § 881(a)(4) authorizes the civil forfeiture of all conveyances used or intended to be used to facilitate a drug offense;

    c.   Title 21, U.S.C., § 881(b) authorizes the civil seizure of any property subject to forfeiture under Title 21, U.S.C., § 881 pursuant to the procedures set forth in Title 18, U.S.C., § 981(b);

    d.   Title 18, U.S.C., § 981(a)(1)(A) authorizes the civil forfeiture of any property involved in a violation of Title 18, U.S.C., §§ 1956 or 1957, as well as any property traceable to that property;

    e.   Title 18, U.S.C., § 981(b)(1) authorizes the civil seizure of any property subject to forfeiture under Title 18, U.S.C., § 981;

    f.   Title 21, U.S.C., § 853(a)(1) authorizes the criminal forfeiture of drug proceeds;

    g.   Title 21, U.S.C. § 853(a)(2) authorizes the criminal forfeiture of all property facilitating a drug offense;

    h.   Title 21, U.S.C., § 853(f) authorizes the criminal seizure of any property subject to forfeiture under Title 21, U.S.C., § 853 provided that a restraining order would be insufficient to ensure the availability of the property for forfeiture;

    i.   Title 18, U.S.C., § 982(a)(1) authorizes the criminal forfeiture of any property involved in a violation of Title 18, U.S.C., §§ 1956 or 1957, as well as any property traceable to that property;

j.   Title 18, U.S.C., § 982(b)(1) provides that the procedures for forfeitures accomplished under Title 18, U.S.C. § 982, including seizure procedures, are the same as those set forth in Title 21, U.S.C., § 853.

## EXPERIENCE AND TRAINING OF AFFIANT

6.    I am a Special Agent (SA) for the Federal Bureau of Investigation (FBI) and have been so employed since July 2014. I am currently assigned to the Norfolk Division, Peninsula Resident Agency, where I am a full-time member of the Safe Streets Peninsula Task Force. Prior to my current assignment, I was assigned to the FBI's Washington Field Office, Special Surveillance Group, where I worked counterintelligence and counterterrorism investigations for approximately four years. In my current assignment, I am responsible for investigating complex criminal enterprises led by drug trafficking organizations and criminal street gangs, to include drug smuggling conspiracies involving the illegal importation, distribution and possession with intent to distribute illegal narcotics, the distribution and trafficking of illegal firearms, and violent crime in aid of racketeering.

7.    Your affiant has personally participated in the investigation of the offenses described in this affidavit.  As a result of your affiant's participation in this investigation and a review of reports made to your affiant by the investigative team, your affiant is familiar with the circumstances of this on-going drug trafficking conspiracy.

8.    I have conducted criminal investigations involving the importation, manufacturing, distribution and sale of illegal narcotics. I am familiar with the methods by which drug trafficking organizations and criminal street gangs conduct their businesses, including but not limited to, their methods of manufacturing and distributing illegal narcotics, their use of telephones and other electronic applications or "apps" in attempt to conduct and conceal their communications, and the various means and methods by which drug traffickers conceal, convert,

transmit, and transport their drug proceeds. Additionally, the information in this affidavit was derived from my personal involvement in the investigation, as well as information I have gained as the result of interviews with other experienced law enforcement officers.  Other information was obtained from the review of documents and reports related to this case. As the case agent, I am fully familiar with the facts of the case.

## EXPERIENCE AND TRAINING OF THE INVESTIGATIVE TEAM

9.      This OCDETF investigation is being conducted by the FBI Norfolk Division Safe Streets Peninsula Task Force, comprised of Special Agents of the FBI and Homeland Security Investigations (HSI), as well as representatives from the Newport News Police Department (NNPD), the Hampton Police Division (HPD), the Virginia Department of State Police (VSP) and the James City County Police Department (JCCPD). The respective agents and officers assigned to this investigation are hereinafter referred to as "the investigative team."

10.     Collectively, I and other members of the investigative team have participated in the preparation of affidavits for search and/or seizure warrants and participated in the execution of search and seizure warrants in connection with drug investigations.  These warrants involved the search of targets' residences, offices, vehicles, and storage units.  Materials searched for and recovered at these locations included narcotics; drug paraphernalia; firearms; records pertaining to the purchase, sale, and distribution of drugs; records relating to the expenditures of profits from drug distribution; currency; and various assets purchased with the proceeds from drug trafficking.

## TECHNIQUES USED BY DRUG TRAFFICKERS

11.     Based on the combined training and experience of members of the investigative team and their participation in other investigations involving federal violations of the Drug Control Act and the Money Laundering Control Act and related offenses, your affiant knows:

a.      That drug traffickers often purchase and/or title their assets in fictitious names, aliases, or

the names of relatives, associates, or business entities to avoid detection of these assets by law enforcement officers;

b.       That even though these assets are in names of other than a targeted drug trafficker, the drug trafficker actually owns and continues to use these assets and exercise dominion and control other them;

c.       That drug traffickers must maintain, on hand, large amounts of U. S. currency in order to maintain and finance their ongoing drug businesses;

d.       That it is common for drug traffickers to maintain books, records, receipts, notes, ledgers, airline instruments, and other papers relating to the transportation, ordering, purchase, sale, and distribution of controlled substances.  The aforementioned books, records, receipts, notes, ledgers, etc. are maintained where the drug traffickers have ready access to them;

e.       That it is common for drug traffickers to secrete contraband including heroin, and cocaine, proceeds of drug sales, and records of drug transactions in secure locations within their residences, their businesses, and/or other locations, such as self-storage units over which they maintain dominion and control, for ready access, and/or to conceal these items from law enforcement authorities;

f.       That, in order to accomplish this concealment, drug traffickers frequently build "stash" places within their residences, their businesses and/or other locations (including buried on the grounds thereof).  There are a number of publications available instructing where and how to build "stash" places.  Copies of these types of publications have been found in the residences of drug traffickers;

g.       That it is common for persons involved in drug trafficking to maintain evidence relating to their obtaining, secreting, transferring and concealing of drugs and/or caches of drugs, large amounts of currency, financial instruments, precious metals and gemstones, jewelry, books, records,

invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, wire transfers, money drafts, letters of credit, safe deposit box keys, money wrappers, and other evidence of financial transactions.  These items are maintained by the drug traffickers within their residences, their businesses or other locations such as self-storage units over which they maintain dominion and control and/or buried on the grounds thereof;

h.      That drug traffickers amass proceeds from the sale of drugs, and they attempt to legitimize these profits through money laundering activities.  To accomplish these goals, drug traffickers utilize numerous methods, including but not limited to:  domestic and international banks and their attendant services, cashier's checks, money orders, money drafts, letters of credit, attorneys, accountants, casinos, real estate, shell corporations and business fronts, and otherwise legitimate businesses that generate large quantities of currency;

i.      That the sale of heroin, cocaine, and other controlled substances generates large quantities of U.S. currency in small denominations (commonly referred to as "street money");

j.      That it is common for drug traffickers to physically handle and count the "street money" after receiving it in exchange for drugs, thereby leaving traces of the drug on the "street money." That law enforcement agencies own dogs that are trained to react to the scent of controlled substances and residue of controlled substances; and that those trained dogs have reacted to drug-tainted currency negotiated at banks and concealed in the residences of drug traffickers and elsewhere;

k.      That it is common for drug traffickers to separate their "street money" by denomination and put this currency in rubber banded stacks in varying $1,000 increments to facilitate quick counting;

l.      That the Courts have recognized that the small and medium denominations of questionable currency, along with the manner in which the currency is handled, carried, and concealed, may

establish probable cause that there is a substantial connection between the questionable currency and drug transactions;

m.     That it is common for drug traffickers to exchange "street money" (small denominations) for large denominations of currency that can be concealed in secure locations within their residences, their businesses, and/or other locations, and/or buried on the grounds thereof, in order to amass a larger amount of currency in less area;

n.     That the Courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed; in particular, drug trafficking;

o.     It is common for individuals who are involved in illegal activities also to evade their individual income taxes by understating their income or not filing individual income tax returns at all;

p.     That the use of overnight courier services such as Federal Express (FEDEX), United Parcel Service (UPS), and United States Postal Service (USPS) is a common method for drug traffickers to transfer money and drugs out of state;

q.     That drug traffickers commonly maintain addresses or telephone numbers in books, papers, pocket telephone cards, wrist watches, cellphones and smart phones which reflect names, addresses, and/or telephone numbers of their associates in the drug trafficking organization;

r.     That it is common for drug traffickers to maintain photographs and electronic images of themselves with their associates of the drug trafficking organization, drugs and/or guns, and assets including large amounts of U.S. currency and vehicles.  Drug traffickers often maintain these images on cellphones and smart phones;

s.     That drug traffickers commonly have in their possession that is on their person, at their residences and/or their businesses, firearms, including but not limited to:  handguns, pistols, revolvers, rifles, shotguns, machine guns, and other weapons.  Said firearms are used to protect and

secure a drug trafficker's property.  Such property may include, but is not limited to:  drugs, drug paraphernalia, jewelry, books, records, and U.S. currency;

t.      That it is common for drug traffickers to use cellular/PCS telephones, smart phones, residential and business telephones, and two-way radios to stay in communication with one another; and

u.      That drug traffickers own and maintain at their residences and businesses, facsimile machines, personal desktop and laptop computers and other similar and related devices, including monitors, printers, keyboards, thumb drives, hard disks, CD-ROMs, hand-held mobile computing devices, operating manuals, and the like, which are used in the commission of criminal offenses and/or which contain evidence of criminal offenses, including, for example, programs to allow users to manage and to track their financial portfolios and generate, transfer, count, record, and/or store the information the information listed in the above paragraphs.

## SOURCES OF PROBABLE CAUSE

12.     The facts comprising the basis for probable cause in this affidavit are derived from a number of sources, including but not limited to:

a.      A review of investigative reports and interviews with law enforcement officers who have investigated members of this criminal organization;

b.      Physical surveillance of members of this criminal organization conducted by members of the investigative team;

c.      Independent investigation by the investigative team including, but not limited to, a review of government records from the National Crime Information Center (NCIC); Lexis-Nexis; and other data bases.

d.      Review and analysis of numerous financial records, including credit reports, bank statements, credit union records, mortgage records, credit card records, business license records,

and income tax records.

## BASIS FOR FACTS CONTAINED IN AFFIDAVIT

13.     Since this affidavit is being submitted only for the limited purpose of securing authorization for search and seizure warrants, I have not included each and every fact known to the investigative team concerning this investigation.  Rather, I have set forth only those facts that are believed to be necessary to establish probable cause to search the aforementioned locations and seize the aforementioned assets.

14.     I have personally participated in the investigation of the offenses described in this affidavit. As a result of my participation in this investigation and a review of reports made to me by other members of the investigative team, I am familiar with the circumstances of this investigation.  On the basis of this familiarity, and on the basis of the other information which I have reviewed and determined to be reliable, I allege the following:

## FACTS AND CIRCUMSTANCES SUPPORTING PROBABLE CAUSE

15.     In September 2014, the FBI Safe Streets Peninsula Task Force opened an investigation into various members of the Bloods criminal street gang operating within the Hampton Roads area of Virginia.  In September 2015, the investigation was approved by the United States Department of Justice as an Organized Crime Drug Enforcement Task Force (OCDETF) investigation targeting multiple members and associates of the Bloods criminal street gang involved in trafficking large amounts of illegal firearms and narcotics. To date, this investigation has tracked the illegal activities of those involved to various states including but not limited to Virginia, New York, New Jersey, Georgia and California.

16.     ALEX JERMAINE BURNETT also known as (a/k/a) "Da Boss" a/k/a "Styles", a six-time felon; ELEONORA PARONUZZI a/k/a "Elle"; ROBERT LEE BURNETT; SHIRLEY DIANE BURNETT; MARIO DEYON BARRETT a/k/a "Rio", a four-time felon; CHARLES

MCMILLAN a/k/a "Cee Mack"; CHARLES BAILEY, JR, a five-time felon; ADA RODRIGUEZ, and others, both known and unknown to the investigative team, have committed, are committing, and will continue to commit, all or some of the offenses involving the distribution and possession with intent to distribute controlled substances in violation of Title 21 United States Code, Section 841, conspiracy to distribute and possess with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 846, possession of firearm by convicted felon, in violation of Title 18, United States Code, Section 922(g), money laundering, in violation of Title 18, United States Code, Section 1956 and 1957, and conspiracy to commit money laundering in violation of Title 18 United States Code, Sections 1956(h).

17.     This OCDETF investigation identified ALEX JERMAINE BURNETT, as a member of "G-Shyne" and/or "Gangsta Killa Bloods" a/k/a "GKB," both subsets of the Bloods criminal street gang, operating a drug trafficking organization ("DTO") responsible for trafficking multi-kilogram quantities of cocaine and heroin throughout Hampton Roads. Over the last two years, the investigative team has identified definitive links to several other subjects of the investigation, identified herein, also involved in the trafficking and distribution of cocaine, crack cocaine, heroin and firearms. Based upon reliable confidential source information, ALEX JERMAINE BURNETT allegedly "inherited" the distribution role of the "family business" from his older brother, Rico Burnett. Rico Burnett was charged in July 2005 by the Virginia State Police with Attempted Capital Murder of a Police Officer, Reckless Driving, Hit and Run, Evading and Eluding Police and Possessing a Firearm as a Convicted Felon after shooting a Virginia State Trooper two times following a high-speed chase. In November 2006, Rico Burnett was found guilty on all counts and sentenced to 91 years in prison.

18.     On or about March 2, 2006, members of the Hampton Police Division (HPD) received five crime line tips concerning ALEX JERMAINE BURNETT and his involvement in

distributing cocaine. At the time, the crime line tips alleged that ALEX JERMAINE BURNETT was selling cocaine out of XXXX Arony Street, Hampton, Virginia; a residence acquired in 2004 and still owned by ROBERT LEE BURNETT and SHIRLEY DIANE BURNETT to this day. Furthermore, the crime line tips also alleged that ALEX JERMAINE BURNETT had a large amount of money and weapons on hand in the residence, and that a large amount of cocaine was also observed inside the residence at XXXX Arony Street. HPD Detectives conducted surveillance on XXXX Arony Street and ALEX JERMAINE BURNETT was later stopped for reckless driving and breach of the peace as a result of an interaction that he had with HPD Detectives. ALEX JERMIANE BURNETT was found to be in possession of marijuana, $1762 in US currency and keys to the residence at XXXX Arony Street.

19.     On or about March 2, 2006, HPD Special Investigations Unit conducted a search warrant at XXXX Arony Street, Hampton, Virginia. During the search of the apartment, two ounces of cocaine, three handguns, a fully automatic M-11 submachine gun and a .223 caliber assault rifle with obliterated serial number were located. ALEX JERMAINE BURNETT was subsequently arrested and charged by Hampton Police Division with Felon in Possession of a Firearm, Possession of an Unregistered Firearm Silencer, Possession of an Unregistered Machinegun and Possession of a Firearm in Furtherance of a Drug Felony. The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) adopted the case and the United States Attorney's Office charged ALEX JERMAINE BURNETT federally. ALEX JERMAINE BURNETT was sentenced to 147 months in federal prison, however, he only served approximately 103 months after receiving a reduction in sentencing. He was released in September of 2013. It should be noted that, for the majority of the illegal activity committed during this investigation, including but not limited to some of the events detailed henceforth, ALEX JERMAINE BURNETT was on supervised federal probation.  He received an order of early termination in February of 2017.

20.     In July of 2015, the Safe Streets Peninsula Task Force began identifying assets and real property belonging to and/or controlled by ALEX JERMAINE BURNETT. Through the course of this investigation, physical and technical surveillance observed ALEX JERMAINE BURNETT utilizing no less than 10 vehicles, to include motorcycles, many of which were utilized in the facilitation of drug trafficking. Several those vehicles were registered to persons other than ALEX JERMAINE BURNETT, to include registered owners outside of the Commonwealth of Virginia and his parents, ROBERT LEE BURNETT and SHIRLEY DIANE BURNETT. Through debriefs of cooperating defendants, the investigative team learned that ALEX JERMAINE BURNETT would meet buyers in the vicinity of 9Rounds Fitness, a gym operated by both ALEX JERMAINE BURNETT and SHIRLEY DIANE BURNETT. They are both listed as signatories with the business bank account at Old Point National Bank, account # XXXXXX1501 ("Old Point #1501") but SHIRLEY is listed as owner of ProFit Resultz, LLC DBA 9Rounds Fitness, with the State Corporation Commission. SHIRLEY DIANE BURNETT files the business income tax returns as a Schedule C (Profit or Loss from Business) on her individual income taxes.

21.     On or about December 11, 2015, members of the investigative team interviewed a cooperating witness (CW#1) at a location in Newport News, VA. CW#1 stated that they came to know of ALEX JERMAINE BURNETT through an acquaintance who had met ALEX JERMAINE BURNETT at a halfway house in Newport News, VA after being released from prison. In the summer of 2015, CW#1 accompanied the acquaintance to ALEX JERMAINE BURNETT's residence near Kecoughtan Road in Hampton, VA to purchase a large quantity of cocaine. ALEX JERMAINE BURNETT provided CW#1's acquaintance with a "softball" size amount of cocaine. In return, CW#1 observed the acquaintance hand ALEX JERMAINE BURNETT a large amount of cash that had been rubber-banded together. CW#1 stated similar

transactions took place on several different occasions, but recalled two of those transactions occurring at Merrimac Apartments. CW#1 recalled that ALEX JERMAINE BURNETT owned a gym in Peninsula Town Center and that the acquaintance met ALEX JERMAINE BURNETT there as well. CW#1 recalled that ALEX JERMAINE BURNETT drove a black motorcycle, and that he and the acquaintance would speak in "code" when conducting "business."

22.     On or about March 3, 2016, a shooting took place at Club Paradise located on Jefferson Avenue, Newport News, Virginia. During review of surveillance footage obtained from the manager of the establishment, two of the shooters involved in the incident were identified as JAMAR GREEN a/k/a "Twix" and ALEX JERMAINE BURNETT. The video depicted GREEN walking over to a vehicle and retrieving something that is closely held by his side. As GREEN returned to the front of the building, ALEX JERMAINE BURNETT is seen exiting the front door wearing a light-colored "beanie" style cap, blue hooded sweatshirt, light colored pants and dark shoes. Moments later, GREEN positioned himself along the corner of the building, raised a black handgun from his side and began to fire the weapon. As GREEN fired the weapon, he stumbled backwards and was assisted by ALEX JERMAINE BURNETT into the foyer of Club Paradise. Once inside, ALEX JERMAINE BURNETT took possession of the firearm, exited the establishment, and fired multiple rounds before he and GREEN fled the scene. The firearm in ALEX JERMAINE BURNETT's possession was equipped with a high-capacity magazine that could be seen protruding from the magazine well of the firearm. Lab reports obtained from the Commonwealth of Virginia Department of Forensic Science found that a number of casings and/or bullet jackets located at the scene had general characteristics consistent with those produced by Glock model .40 caliber handguns. Glock model handguns are not manufactured or assembled within the Commonwealth of Virginia.

23.     On or about April 30, 2016, during a phone call with a Confidential Source (CS#1), ALEX JERMAINE BURNETT further discussed his participation in "G-Shyne" and stated that he had been "banging for 11 years." He told CS#1 that his "girl is from Brooklyn" and bragged that she told him "You're a Boss. Not a Soldier. Get out of the streets." The investigative team identified ALEX JERMAINE BURNETT's girlfriend at the time as ADA RODRIGUEZ. ADA RODRIGUEZ is also the mother of one of ALEX JERMAINE BURNETT's children. Despite stating that he was staying low to avoid getting into trouble, and that he is "on papers", referring to his probation status at the time, ALEX JERMAINE BURNETT goes on to talk about "getting into shootouts." ALEX JERMAINE BURNETT explained to CS#1 that his friend was involved in a shootout and got hit. In describing the event to CS#1 ALEX JERMAINE BURNETT stated "I came outside and I grabbed his 'strap and shot 15 times. I was on tape. He was on tape."

24.     On or about May 3, 2016, CS#1 met with ALEX JERMAINE BURNETT in front of the 9Rounds Fitness located at XXXX East Claiborne Square, Hampton, Virginia. During a lengthy conversation, ALEX JERMAINE BURNETT detailed his involvement in various avenues of illegal activity. ALEX JERMAINE BURNETT, a convicted felon, commented that he had a firearm with a tripod and night sights and engaged CS#1 in a discussion about an "FN," also a brand of firearm. Virginia State Police Firearms Transaction Center records disclosed that ELEONORA PARONUZZI, the current girlfriend and mother of ALEX JERMAINE BURNETT'S most recent child, purchased a firearm on December 6, 2016 from Superior Pawn in Norfolk, Virginia. Transaction records from Superior Pawn disclosed that the handgun ELEONORA PARONUZZI purchased was an FN HERSTAL 57, bearing serial number XXXXX7618.

25.     ALEX JERMAINE BURNETT went on to describe his involvement as a member "G-Shyne" and/or "GKB" and how he was "brought home" during his previous incarceration. ALEX

JERMAINE BURNETT discussed cocaine and stated that his source is a Puerto Rican millionaire that drove buses up north. ALEX JERMAINE BURNETT told CS#1 that the cocaine is "1,200 all day long" and that he does not sell "halves," referring to half-ounce quantities. He further stated that he is all about presentation and that when he "breaks if off" it "stays solid…no shake." The term "solid" in this context often refers to an amount of cocaine that has been cut from a kilo of cocaine, and has been repressed or "blocked" to retain its shape. Conversely, cocaine that is not pressed can retain a powdery consistency known as "shake." ALEX JERMAINE BURNETT boasted that he was doing "eight bricks" a month but then his money got "messed up." The term "bricks" is commonly known by law enforcement to be code or slang for a "kilo" or kilogram, referring to 1000 grams of a narcotic controlled substance. The statement by ALEX JERMAINE BURNETT that he was doing "eight bricks" suggests, by his own admission, that he was trafficking no less than eight (8) kilograms of cocaine over or during a 28 to 31 day period. As ALEX JERMAINE BURNETT and CS#1 talked further, ALEX JERMAINE BURNETT spoke about two persons that owed him money. ALEX JERMAINE BURNETT stated that both individuals owed him 12 "stacks," with the term "stack" being a reference commonly known by law enforcement to mean "one thousand." ALEX JERMAINE BURNETT told CS#1 that one of the individuals broke into his place off Kecoughtan Road and that he wanted to "kill this nigga." Before parting, ALEX JERMAINE BURNETT told CS#1 that he was on federal probation for the past three years and received five years in total. He boasted to CS#1 that he was the "face of Town Center," a reference to the Peninsula Town Center shopping district where 9Rounds Fitness is located.

26.     On or about July 27, 2016, members of the investigative team interviewed a Cooperating Defendant (CD#1) at a location in Chesapeake, Virginia. CD#1 was arrested in 2016 and charged with Conspiracy to Distribute Heroin in the Eastern District of Virginia and is seeking a Rule 35

for his cooperation with law enforcement. CD#1 met ALEX JERMAINE BURNETT, who he referred to as "A," at a barbershop on Hampton University. The two were acquaintances through mutual associates and, as both CD#1 and ALEX JERMAINE BURNETT were involved in selling cocaine at the time, CD#1 began buying ALEX JERMAINE BURNETT's product. CD#1 could not recall specific dates and times, but from sometime in 2013 or 2014 to approximately November of 2015 he estimated that he obtained cocaine through ALEX JERMAINE BURNETT for no less than a period of one year. CD#1 purchased cocaine from ALEX JERMAINE BURNETT through two mutual associates, but never bought directly from ALEX JERMAINE BURNETT. CD#1 believed that both associates were being fronted cocaine by ALEX JERMAINE BURNETT, and knew one of the associates to meet ALEX JERMAINE BURNETT near his gym. CD #1 recalled purchasing one ounce of cocaine on 12 to 13 occasions from these two associates of ALEX JERMAINE BURNETT.

27.     CD#1 knew ALEX JERMAINE BURNETT to own and operate 9Rounds Fitness and drive a Hummer with a paint scheme that advertised the 9Rounds gym. CD#1 described ALEX JERMAINE BURNETT as very arrogant. In November of 2015, ALEX JERMAINE BURNETT bragged about buying purses that cost upwards of $3,000 for a girlfriend whose apartment he allegedly paid for in the City Center area of Newport News, Virginia. He also spoke about having multiple girlfriends in multiple locations. CD#1 also knew ALEX JERMAINE BURNETT to "hustle" in spurts, selling heavily for a period and then laying low for some time. CD#1 did not elaborate further on the pace of ALEX JERMAINE BURNETT's cocaine distribution; however, the investigative team believes that the statement likely referred to the ebb and flow of most drug traffickers in response to local arrests, pro-active police initiatives and other factors that increase the level of caution at which they operate.

28.     In the summer or fall of 2015, ALEX JERMAINE BURNETT's residence was allegedly broken into; a diamond studded Presidential Rolex valued at $35,000, and an unknown amount of cocaine were stolen. Approximately three days after the alleged robbery, two individuals were murdered at a residence in Newport News, Virginia. CD#1 informed the investigative team that after the alleged robbery, the mother of one of the murdered individuals attempted to sell CD#1 a diamond-studded Rolex, but CD#1 never told ALEX JERMAINE BURNETT.

29.     Shortly thereafter, CD#1 was in the aforementioned barbershop on Hampton University when ALEX JERMAINE BURNETT entered and dumped a bag containing a large amount of cash onto the floor. ALEX JERMAINE BURNETT exclaimed to those inside that "it" did not hurt him, which CD#1 took as a reference to the aforementioned robbery. CD#1 assisted ALEX JERMAINE BURNETT in picking up the cash and in doing so estimated there to be approximately $100,000 in total.

30.     To date the investigative team has completed multiple controlled evidence purchases to include cocaine, heroin and firearms, from ALEX JERMAINE BURNETT and others both named and unnamed in this document. ALEX JERMAINE BURNETT and co-conspirators arranged the sale of this contraband to take place at various locations throughout the Hampton Roads area. The investigative team utilized various investigative methods to document these transactions, including but not limited to physical surveillance of the events themselves, audio and/or video captured by a Confidential Source, Precision Location Information (PLI) or GPS data on target phones, and technical surveillance on residences occupied by ALEX JERMAINE BURNETT and co-conspirators. Through these investigative means, surveillance of not only the transaction but ALEX JERMAINE BURNETT's whereabouts both before and after the transaction have been documented.

31.     On or about February 17, 2017, CS#1 conducted a controlled purchase of heroin from MARIO DEYON BARRETT while under physical and electronic surveillance[1]. CS#1 contacted MARIO DEYON BARRETT by telephone and arranged the purchase of five grams of heroin. Prior to meeting with MARIO DEYON BARRETT, CS#1 communicated with ALEX JERMAINE BURNETT via phone in regards to purchasing the heroin. In a text message, ALEX JERMAINE BURNETT wrote to CS#1 "I think I have 4gs left I omw to Williamsburg." In a subsequent text message to CS#1, ALEX JERMAINE BURNETT commented on the quality of the heroin and implicated CHARLES MCMILLAN when he wrote "Well I'm definitely trying to get wit u ppl say its good Im giving Mack a g later." When CS#1 and ALEX JERMAINE BURNETT spoke on the phone regarding the deal, ALEX JERMAINE BURNETT told CS#1 "Yo you can meet my homie, I will give you the number right now," after which CS#1 contacted MARIO DEYON BARRETT. MARIO DEYON BARRETT sent a text message providing his address to CS#1 that read "XXX maplewood st Hampton va 23669." CS#1 met MARIO DEYON BARRETT at XXX Maplewood Street, Hampton, Virginia during which time MARIO DEYON BARRETT entered CS#1's vehicle and handed CS#1 a bag of heroin. During the transaction, MARIO DEYON BARRETT told CS#1 "…he just got that shit in, you know we going to have some more coming in though." Prior to leaving, CS#1 asked MARIO DEYON BARRETT for his "handle," or street name, and MARIO DEYON BARRETT responded "Rio." Two days later, CS#1 received a text message from MARIO DEYON BARRETT that read "how was it" to which CS#1 replied "it was iight." When CS#1 subsequently sent a text message to MARIO DEYON BARRETT stating "yea I couldn't add to it like I wanted", MARIO DEYON BARRETT replied "Ok I'll tell bro." Based on the communications via phone and the conversation that took place during the controlled evidence purchase, you Affiant believes that

---

[1] FBI consensual monitoring data verified all of the call activity described in this paragraph.

the statement "Ok I'll tell bro" refers to MARIO DEYON BARRETT relaying the information back to ALEX JERMAINE BURNETT.

32.     On or about March 9, 2017, CS#1 conducted a controlled purchase of heroin from ALEX JERMAINE BURNETT while under physical and electronic surveillance[2]. CS#1 contacted ALEX JERMAINE BURNETT via telephone and arranged the purchase of one-half ounce of heroin. ALEX JERMAINE BURNETT met CS#1 in the vicinity of Langley Square in Hampton, Virginia and was accompanied to the transaction by ELEONORA PARONUZZI. The vehicle utilized by ALEX JERMAINE BURNETT and ELEONORA PARONUZZI during the transaction, a 2014 Nissan Altima bearing Commonwealth of Virginia license plates WNG-1878, was registered to ELEONORA PARONUZZI of Newport News, Virginia.  The 2014 Nissan Altima has VIN # XXXXXXXXXXXXX3322. CS#1 provided ALEX JERMAINE BURNETT with $1,000 in cash for which ALEX JERMAINE BURNETT provided CS#1 approximately 15 grams of heroin. During the transaction, ALEX JERMAINE BURNETT told CS#1 "he just got some stronger shit, it's a little more expensive but he said that shit is stronger too…that's some new shit, but he got some stronger shit too." As ALEX JERMAINE BURNETT and ELEONORA PARONUZZI began to drive away, he told CS#1 "you need to get with me on this fish-scale I got." The term "fish-scale" is a term commonly used by drug traffickers when referring to a higher quality of powder cocaine. A Drug Field Test performed on the heroin yielded a positive result for "Opiates and Amphetamine Type Compounds." The controlled purchase was consensually monitored by law enforcement and audio/video was captured by CS#1.

33.     On or about August 11, 2016, CS#1 conducted a controlled purchase of crack cocaine and two firearms from CHARLES MCMILLAN and CHARLES BAILEY, JR. while under

---

[2] FBI consensual monitoring data verified all of the call activity described in this paragraph.

physical and electronic surveillance[3]. CS#1 contacted CHARLES MCMILLAN via telephone at an earlier date during which time CHARLES MCMILLAN offered to sell CS#1 both firearms and narcotics. CHARLES MCMILLAN met CS#1 in the vicinity of the Power Plant Shopping Center in Hampton, Virginia. The vehicle utilized by CHARLES MCMILLAN during the transaction, a 2006 Infiniti sedan bearing Commonwealth of Virginia license plates XXX-2961, was registered to L.L.S. of Newport News, Virginia. CS#1 provided CHARLES MCMILLAN with $1000 in cash for which CHARLES MCMILLAN provided CS#1 with a handgun and a short-barrel rifle. CHARLES MCMILLAN then told CS#1 that they would need to meet CHARLES MCMILLAN's father, CHARLES BAILEY JR, to obtain the crack cocaine. CS#1 followed CHARLES MCMILLAN approximately two miles to a secondary location where they met CHARLES BAILEY JR. CS#1 and CHARLES BAILEY JR. both entered CHARLES MCMILLAN's vehicle, during which time CS#1 provided CHARLES BAILEY, JR. with $700 for which CHARLES BAILEY, JR. provided CS#1 with approximately 15.1 grams of crack cocaine to complete the deal. A Drug Field Test performed on the crack cocaine yielded a positive result for "Cocaine Salts and Base Reagent." The controlled purchase was consensually monitored by law enforcement and audio/video was captured by CS#1.

34.     On or about August 17, 2016, CS#1 conducted a controlled purchase of an assault rifle from CHARLES MCMILLAN while under physical and electronic surveillance[4]. CS#1 contacted CHARLES MCMILLAN via telephone and arranged the sale of the weapon. CHARLES MCMILLAN met CS#1 in the vicinity of the Power Plant Shopping Center in Hampton, Virginia. The vehicle utilized by CHARLES MCMILLAN during the transaction, a 2006 Infiniti sedan bearing Commonwealth of Virginia license plates XXX-2961, was registered to L.L.S. of Newport News, Virginia. CS#1 provided CHARLES MCMILLAN with $600 in

---

[3] FBI consensual monitoring data verified all of the call activity described in this paragraph.
[4] FBI consensual monitoring data verified all of the call activity described in this paragraph.

cash for which CHARLES MCMILLAN provided CS#1 with an AK47 style assault rifle chambered to fire 7.62 caliber rounds. CHARLES MCMILLAN represented the firearm as "fully automatic" but a documented test-fire performed by the investigative team determined the weapon to be semi-automatic. During the transaction, CS#1 and CHARLES MCMILLAN discussed various matters related to the Bloods criminal street gang and drug trafficking. CHARLES MCMILLAN described suppling cocaine to an associate by stating "he asked me…about the soft or whatever…and I said if you really ready to step in that lane, I'll give you something, and you can just make your money off that, and then when you come back, then it will be straight bread…I'll put you on your feet". The controlled purchase was consensually monitored by law enforcement and audio/video was captured by CS#1.

35.     On or about May 4, 2017, CS#1 conducted a controlled purchase of crack cocaine from CHARLES MCMILLAN while under physical and electronic surveillance[5]. CS#1 arranged the purchase of one-half ounce of crack cocaine from CHARLES BAILEY JR, however, CHARLES MCMILLAN delivered the narcotics to CS#1. CHARLES MCMILLAN met CS#1 in the vicinity of Power Plant Shopping Center in Hampton, Virginia. The vehicle utilized by CHARLES MCMILLAN during the transaction, a 2004 BMW coupe, bearing Commonwealth of Virginia license plates XXX-6130 and VIN # XXXXXXXXXXXXX0064, was registered to M.N.F of Norfolk, Virginia. CS#1 provided CHARLES MCMILLAN with $700 in cash for which CHARLES MCMILLAN provided CS#1 with approximately 15.0 grams of crack cocaine. During the transaction, CS#1 asked CHARLES MCMILLAN "what's the numbers?" to which CHARLES MCMILLAN responded "he wants 7 for that." CS#1 and CHARLES MCMILLAN began to discuss "Alex", during which time CHARLES MCMILLAN told CS#1 that he owed ALEX JERMAINE BURNETT $1,100 and that his father, CHARLES BAILEY

---

[5] FBI consensual monitoring data verified all of the call activity described in this paragraph.

JR, owed ALEX JERMAINE BURNETT $500. As the conversation continued, CHARLES MCMILLAN told CS#1 that he made almost $1,400 in profit from $600 worth of cocaine that he obtained through his father's connection in New York. A Drug Field Test performed on the crack cocaine yielded a positive result for "Cocaine Salts and Base Reagent." The controlled purchase was consensually monitored by law enforcement and audio/video was captured by CS#1.

36.     On or about May 8, 2017, CS#1 conducted a controlled purchase of crack cocaine from CHARLES BAILEY, JR. while under physical and electronic surveillance[6]. CS#1 contacted CHARLES BAILEY, JR. via telephone to arrange the sale of 10 grams of crack cocaine. CHARLES BAILEY, JR. met CS#1 in the vicinity of the 1900 block of 25th Street in Newport News, Virginia. The vehicle utilized by CHARLES BAILEY, JR. during the transaction, a 2004 Porsche coupe, bearing Commonwealth of Virginia license plates XXX-4105 and VIN # XXXXXXXXXXXXX0124, was registered to W.D.B. of Newport News, Virginia. CS#1 provided CHARLES BAILEY, JR. with $500 in cash for which CHARLES BAILEY, JR. provided CS#1 with approximately 10.9 grams of crack cocaine. During the transaction, CHARLES BAILEY, JR. detailed his methods of trafficking cocaine, stating "I've been doing this shit a long time" and "I got a nigga in New York, the prices is good, it's just the trip. You know what I'm saying, I used to do that shit every two weeks, but that shit is stressful man…coming back with goddamn 500 grams and all that in the car. See I used to go in…that was part of my cover…I'll go in like the Porsche. But when I come back I'm suit and tie down, me and wifey, she got the business attire on, I got the business attire on, so when they look that ain't nothing but a businessman." Later on in the conversation, CS#1 tells CHARLES BAILEY, JR. "Yeah, cause I just told Mack, I said yo listen man, why we play'n games with Alex like that? Let's all three of us come together, drop a nice amount on that nigga, and the prices going

---

[6] FBI consensual monitoring data verified all of the call activity described in this paragraph.

to come down" to which CHARLES BAILEY, JR. replied "mm-hmm." A Drug Field Test performed on the crack cocaine yielded a positive result for "Cocaine Salts and Base Reagent." The controlled purchase was consensually monitored by law enforcement and audio/video was captured by CS#1.

37.    On or about June 15, 2017, CS#1 conducted a controlled purchase of heroin from ALEX JERMAINE BURNETT while under physical and electronic surveillance[7].   CS#1 contacted ALEX JERMAINE BURNETT via phone and arranged the purchase of one-half ounce of heroin. ALEX JERMAINE BURNETT met CS#1 in the vicinity of One Life Fitness in Newport News, Virginia, and was accompanied to the transaction by ELEONORA PARONUZZI. ELEONORA PARONUZZI was seated in the front passenger seat of the vehicle upon arrival, but can be seen on video standing outside of the vehicle and observing the interactions between ALEX JERMAINE BURNETT and CS#1. The vehicle utilized by ALEX JERMAINE BURNETT and ELEONORA PARONUZZI during the transaction, a 2014 Nissan Altima bearing Commonwealth of Virginia license plates XXX-1878, was registered to ELEONORA PARONUZZI of Newport News, Virginia. CS#1 provided ALEX JERMAINE BURNETT with $1000 in cash for which ALEX JERMAINE BURNETT provided CS#1 with approximately 18.0 grams of heroin. A Drug Field Test performed on the heroin yielded a positive result for "Opiates and Amphetamine Type Compounds." The controlled purchase was consensually monitored by law enforcement and audio/video was captured by CS#1.

38.    On or about July 24, 2017, CS#1 conducted a controlled purchase of an assault rifle from ALEX JERMAINE BURNETT while under physical and electronic surveillance[8].   CS#1 contacted ALEX JERMAINE BURNETT via telephone and arranged the purchase of a modified assault rifle, chambered to fire .223 caliber rounds, that was offered by ALEX JERMAINE

---

[7]  FBI consensual monitoring data verified all of the call activity described in this paragraph.
[8]  FBI consensual monitoring data verified all of the call activity described in this paragraph.

BURNETT during a previous drug transaction. ALEX JERMAINE BURNETT met CS#1 in the vicinity of Old Hampton, Hampton, Virginia and was accompanied by ELEONORA PARONUZZI and an infant child. ELEONORA PARONUZZI was seated in the backseat of the vehicle and was feeding the infant at the time. Prior to their arrival, technical surveillance observed ALEX JERMAINE BURNETT exiting the residence at XXX Drivers Lane, Newport News, Virginia carrying an infant car seat and placing that infant car seat in the back seat of a Nissan Altima bearing Commonwealth of Virginia license plates XXX-1878; that vehicle was under physical surveillance while in route to the transaction location. The vehicle utilized by ALEX JERMAINE BURNETT and ELEONORA PARONUZZI during the transaction, the aforementioned 2014 Nissan Altima bearing Commonwealth of Virginia license plates XXX-1878, was registered to ELEONORA PARONUZZI of Newport News, Virginia. As ALEX JERMAINE BURNETT entered CS#1's vehicle, he told ELEONORA PARONUZZI "Hey, I'm going to Rio's house and come right back." After ELEONORA PARONUZZI responded, ALEX JERMAINE BURNETT stated to her "I can't hear you…I'm going to Rio's house. I'm going right there." As they began driving, ALEX JERMAINE BURNETT handed a bag of heroin to CS#1 and stated "You see how dark that shit is, right? Throw one on that bitch, that's Twelve Five, ya feel me? Twelve Five and then basically the whole zip is 2500. You put one on that and you can't beat that bitch. And that bitch…you gonna call me right back nigga…right back…this shit is a missile." When CS#1 and ALEX JERMAINE BURNETT arrived at XXX Maplewood Street, Hampton, Virginia, MARIO DEYON BARRETT exited the front door of the residence. MARIO DEYON BARRETT was agitated and could be heard complaining to ALEX JERMAINE BURNETT of possible surveillance in the area. MARIO DEYON BARRETT and ALEX JERMAINE BURNETT looked around the area before entering the residence. ALEX JERMAINE BURNETT exited the residence carrying the assault rifle and placed the firearm in

the backseat of CS#1's vehicle. CS#1 provided ALEX JERMAINE BURNETT with $1500 for which ALEX JERMAINE BURNETT provided CS#1 with the Spike's Tactical AR-15 assault rifle that he retrieved from MARIO DEYON BARRETT's residence. As the two drove back to ELEONORA PARONUZZI's vehicle, ALEX JERMAINE BURNETT told CS#1, regarding the firearms, "they be get'n them shits like every week...them shits be coming through...different joints." Perhaps distracted by the possibility of surveillance, ALEX JERMAINE BURNETT exited CS#1's vehicle and entered ELEONORA PARONUZZI's vehicle so quickly that he forgot to take payment for the assault rifle. CS#1 contacted ALEX JERMAINE BURNETT via telephone and the two agreed to meet behind a Target store so that CS#1 could provide ALEX JERMAINE BURNETT with payment. As the two vehicles slowly roll pass each other behind Target, CS#1 hands ALEX JERMAINE BURNETT $1,500 in cash through the driver-side, front window and both vehicles proceed on. ELEONORA PARONUZI was now seated in the front passenger seat of her vehicle. The bag of heroin ALEX JERMAINE BURNETT fronted CS#1 during the transaction contained approximately 14.9 grams of heroin. A Drug Field Test performed on the heroin yielded a positive result for "Opiates and Amphetamine Type Compounds." The controlled purchase was consensually monitored by law enforcement and audio/video was captured by CS#1.

39.     Utilizing physical and technical surveillance, the investigative team believes ALEX JERMAINE BURNETT maintains at least three residences, XXXXX Batiste Court, Carrollton, Virginia; XXX Drivers Lane, Newport News, Virginia; and XXXX Sawgrass Lane, Portsmouth, Virginia, and one business, XXXX East Claiborne Square, Hampton, Virginia, that facilitated the packaging, storage and distribution of cocaine and/or heroin. It is also believed that two of these residences, XXXXX Batiste Court, Carrollton, Virginia and XXX Drivers Lane, Newport News, Virginia contain both instruments and fruits of the crimes described herein. Through the use of

PLI, the investigative team has successfully developed investigative leads as well as corroborated observations both included and not included within this document. Through the analysis of that PLI data, the investigative team was able to ascertain patterns and trends in ALEX JERMAINE BURNETT's movements, to include locations he frequented. On multiple occasions, PLI data from telephones utilized by ALEX JERMAINE BURNETT showed that telephone at, or within the curtilage of, the residence located at XXXXX Batiste Court, Carrollton, Virginia, to include outbuildings and structures behind the residence itself. PLI data also confirmed both physical and technical surveillance when placing phones utilized by ALEX JERMAINE BURNETT within the residence located at XXX Drivers Lane, Newport News, Virginia.

40. The investigative team observed ALEX JERMAINE BURNETT and ELEONORA PARONUZZI depart the residence at XXX Drivers Lane, Newport News, Virginia prior to drug transactions and return to that residence after drug transactions, while travelling direct routes to and from each time. Vehicles, to include the 2014 Nissan Altima bearing Commonwealth of Virginia license plates XXX-1878, registered to ELEONORA PARONUZZI at XXX Drivers Lane, Newport News, Virginia; a 2013 Jeep Grand Cherokee bearing Commonwealth of Virginia license plates XXX-2229, registered to ALEX JERMAINE BURNETT at XXXXX Batiste Court, Carrollton, Virginia; and a 2016 Kawasaki Ninja motorcycle bearing Commonwealth of Virginia license plates XXXXXX, initially registered to ELEONORA PARONUZZI at XXXXX Batiste Court, Carrollton, Virginia but currently registered to ELEONORA PARONUZZI and ALEX JERMAINE BURNETT at XXX Drivers Lane, Newport News, Virginia, were all utilized in the facilitation of multiple drug-related transactions and kept at the residence located at XXX Drivers Lane, Newport News, Virginia. A 2013 Ford F-150, bearing Commonwealth of Virginia license plates XXX-6645 and VIN # XXXXXXXXXXXXX3519, registered to ROBERT LEE

BURNETT at XXXXX Batiste Court, Carrollton, Virginia, was utilized in the facilitation of a drug transaction on May 26, 2016 but is believed to be kept at XXXXX Batiste Court, Carrollton, Virginia. During that transaction, ALEX JERMAINE BURNETT provided three ounces of powder cocaine to CS#1 for which CS#1 provided ALEX JERMAINE BURNETT with $3,600 in cash. ALEX JERMAINE BURNETT unlocked the 2013 F-150 bearing Commonwealth of Virginia license plates XXX-6645 and instructed CS#1 to place the cash inside the vehicle; CS#1 actually entered the vehicle and placed the money inside. The business, 9Rounds Fitness, located at 4321 East Claiborne Square, Hampton, Virginia, was utilized in the storage and facilitation of cocaine and/or heroin on no less than five occasions. Confidential Source reporting also indicates that ALEX JERMAINE BURNETT would routinely have customers come to the 9Rounds Fitness gym to complete drug transactions. This included CS#1 meeting ALEX JERMAINE BURNETT at 9Rounds Fitness on or about May 18, 2016 and ALEX JERMAINE BURNETT taking CS#1 into 9Rounds Fitness and showing him a duffle bag containing at least one half kilogram of cocaine. On another occasion, on or about June 16, 2016, ALEX JERMAINE BURNETT had CS#1 meet him at 9Rounds Fitness and exited the gym with an envelope containing cocaine. ALEX JERMAINE BURNETT and CS#1 sat on a bench directly adjacent to the gym entrance and as the two conversed, ALEX JERAMINE BURNETT discreetly handed the envelope to CS#1.

41.    In June 2016, ALEX JERMAINE BURNETT approached two females and began an unsolicited conversation inside of a business establishment in Hampton, Virginia. Unbeknownst to ALEX JERMAINE BURNETT, the two females he approached were FBI Agents conducting a surveillance. Through their own observations that night, the Agents took notice of ALEX JERMAINE BURNETT being very social and his approach to numerous women throughout the night. During the conversation, ALEX JERMAINE BURNETT introduced himself as "Alex" and

as the owner of 9Rounds Fitness located in Peninsula Town Center. Over the course of a lengthy conversation he boasted about various topics in his life. Regarding 9Rounds Fitness, ALEX JERMAINE BURNETT told the Agents that he put $20,000 of his own money down but the rest of the business was paid for by an "unknown source" and that he had "no idea" who gave him the rest of the money. ALEX JERMAINE BURNETT then alluded that "the mafia" was the source of the funds. He followed up by stating that he "knows people" and "people give me things because I'm connected."

42.     ALEX JERMAINE BURNETT boasted about a female, who he called a "unicorn," that gave him money and offered to buy him a Land Rover. He provided that she was from Venice, Italy and spoke with a strong accent. The Agents noted that ALEX JERMAINE BURNETT made it clear that this female was not his girlfriend. He continued to discuss other assets and mentioned that he lived in a waterfront condominium in Portsmouth at the time, and that he had put $40,000 of his own money toward the purchase of the property. ALEX JERMAINE BURNETT told the Agents that he wanted to buy a third home, something with a lot of property, because he was a "country boy" from South Carolina who wanted to "ride my quads and shoot my guns." To date, the investigative team has identified numerous "quads" or 4-wheeler style ATVs through photographs and videos posted by ALEX JERMAINE BURNETT to various social media accounts. Through those videos and photographs it was determined that he was keeping these assets at the XXXXX Batiste Court location. Based on the totality of ALEX JERMAINE BURNETT's statements and other information provided herein, your Affiant believes that the "guns" which ALEX JERMAINE BURNETT referred to are being maintained at the same location as the "quads."

43.     During this same conversation, ALEX JERMAINE BURNETT told the Agents that he had eight (8) cars; three of which were a H2 Hummer, a Jeep and a Ford F-150, all of which are referenced in this document and have been utilized in the facilitation of narcotics transactions. He

stated that he was the youngest of three children – because of which he was spoiled by his parents. He stated that his father had done 22 years of military service and worked as a government contractor, and that his mother took care of and organized finances for his 9Rounds Fitness business because she "worked" in finance. The Agents noted to your affiant that ALEX JERMAINE BURNETT commented on being "cut off" by his parents because he "blew through" $230,000, but that he did not elaborate further. This statement, along with his statements referring to assets and real property already known to the investigative team, and other facts stated herein, further establishes probable cause that the items listed in "Attachment B" may be maintained at the locations contained within this affidavit.

44.     Based on training and experience of your affiant, it is common for drug traffickers to maintain books, records, receipts, notes, ledgers, airline instruments, and other papers relating to the transportation, ordering, purchase, sale, and distribution of controlled substances at their place of residence.  It is common for drug traffickers to secrete contraband including heroin, and cocaine, proceeds of drug sales, weapons and records of drug transactions in secure locations within their vehicles, residences, their businesses, and/or other locations, such as self-storage units over which they maintain dominion and control, for ready access, and/or to conceal these items from law enforcement authorities.

## SUMMARY OF FINANCIAL INFORMATION and ANALYSIS

45.     The financial investigation has identified very few assets in ALEX JERMAINE BURNETT's name; however, it has identified assets in the form of real property, vehicles, and bank accounts in the name of ROBERT LEE BURNETT and SHIRLEY DIANE BURNETT.

46.     Banking and financial evidence obtained for ROBERT LEE BURNETT and SHIRLEY DIANE BURNETT reflects that they opened a personal checking account at Old Point National

Bank in December 2006, as sole owners, of account # XXXXXXX5006 ("Old Point #5006"). ROBERT LEE BURNETT and SHIRLEY DIANE BURNETT have also maintained a personal checking account at SunTrust Bank since at least April 2009, as sole owners, account # XXXXXXXXXXX2602 ("SunTrust #2602").

47.     FBI Forensic Accountants (FoA) determined that SHIRLEY DIANE BURNETT holds a civilian position, GS12, with the Federal Government and earns approximately $45,000 a year net income. ROBERT LEE BURNETT receives Federal Government net retirement income of approximately $15,000 annually. He also held a civilian position, GS12, with the Federal Government until he retired around December 2015, from which he receives between $45,000 and $50,000 net income annually.   ROBERT LEE BURNETT also began to receive $1,697 monthly from Social Security benefits in January 2016.   Their annual disposable income is approximately $122,000.   ROBERT LEE BURNETT and SHIRLEY DIANE BURNETT also have several rental properties with rental income checks, but claim a loss on their individual income tax returns.

48.     Concerning 2015, the FoAs calculated that ROBERT LEE BURNETT and SHIRLEY DIANE BURNETT's estimated known sources of funds were $238,000, of which were almost consumed by just four of their numerous expenditures and disbursements: $138,700 on mortgages, $18,900 towards their home equity line of credit; $40,800 on credit cards, and $15,900 towards church contributions. These expenses total over $214,000 of their $238,000 known sources.

49.     Two accounts of ROBERT LEE BURNETT and SHIRLEY DIANE BURNETT's in particular, Old Point #5006 and SunTrust #2602, show large quantities of cash flowing through that does not appear to have a legitimate source.  For solely 2015, ROBERT LEE BURNETT

and SHIRLEY DIANE BURNETT's known sources of funds and expenditures are reflected in the table below:

**ROBERT & SHIRLEY BURNETT – 2015**
**EXPENDITURES IN EXCESS OF KNOWN SOURCES OF FUNDS**

| KNOWN SOURCES OF FUNDS: | AMOUNT |
|---|---|
| Disposable Income (From IRS Form 1040, includes ProFit & Rental property net losses) | $ 121,705.00 |
| Cash on hand **beginning** of the year: | |
|    Old Point #5006 | $ 97,949.00 |
|    SunTrust #2602 | $ 18,239.00 |
| Bank Statement Disbursements Refunds | $ - |
| **2015 TOTAL KNOWN SOURCES OF FUNDS** | **$ 237,893.00** |

| EXPENDITURES: (Application of Funds) | |
|---|---|
| Mortgage and Loan Payments | $ 56,800.00 |
| Mortgage payoff to Sterns Lending (XXXX Loring Ct) | $ 81,900.00 |
| Home Equity Line of Credit - Payments on | $ 18,900.00 |
| Credit Cards | $ 40,800.00 |
| Church | $ 15,900.00 |
| | |
| Utilities | $ 12,900.00 |
| Federal and Local Taxes | $ 12,500.00 |
| Legal | $ 8,570.00 |
| Insurance | $ 6,000.00 |
| Retail Purchases | $ 4,000.00 |
| Groceries | $ 3,900.00 |
| Cash withdrawals | $ 1,500.00 |
| Automobile | $ 1,200.00 |
| Kubota Tractor | $ 2,000.00 |
| Miscellaneous Expenditures, fuel, pet, entertain | $ 7,400.00 |
| Cash on hand **end** of the year: | |
|    Old Point #5006 | $ 40,943.00 |
|    SunTrust #2602 | $ 8,648.00 |
| **2015 TOTAL EXPENDITURES** | **$ 323,861.00** |

| **TOTAL FUNDS FROM UNKOWN OR ILLEGAL SOURCES** | **$ 85,968.00** |
|---|---|

| Old Point #5006 | $ 3,000.00 |
|---|---|
| SunTrust #2602 | $ 48,484.00 |
| **2015 TOTAL CASH DEPOSITS** | **$ 51,484.00** |

50.     In addition to the above, in 2014 SunTrust #2602 had $25,982 in cash deposits and Old Point #5006 had $16,130 in cash deposits.  In 2016 SunTrust #2602 had $19,583 in cash deposits and Old Point #5006 had $50 in cash deposits. In 2017, from January through approximately June, SunTrust #2602 had $12,850 in cash deposits and Old Point #5006 had $0 in cash deposits. None of the legitimate income sources described in paragraph 47 above are paid in cash; they are paid through direct deposit or check. The ProFit Resultz, LLC gym business, 9Rounds Fitness, described herein has its own bank account at Old Point #1501 and shows cash deposits; $15,581 in 2015, $400 in 2016 and in 2017, from January through June, $2,700 in cash deposits.

51.     The cash deposits into Old Point #5006 and SunTrust #2602, described above, were co-mingled with the legitimate source funds described in paragraph 47 above and these co-mingled funds were then used to pay towards mortgages, lines of credit, credit cards, vehicles, equipment and expenses related to the ProFit Resultz, LLC business.

52.     FoAs have identified over $100,000 in unexplained cash deposits and transactions during the investigative period between multiple accounts owned and/or operated by ROBERT LEE BURNETT and SHIRLEY DIANE BURNETT. Cash was also used towards the purchase of a Hummer H2 Sport Utility Vehicle, Kubota Tractor and Mower, Utility dump trailer and Ford F-350 Truck.

53.     In particular, on August 13, 2014, ROBERT LEE BURNETT purchased from Stevenson Tractor, a Kubota Diesel Tractor MDL XXXXDLB-R-1 and 54" side discharge mower attachment model RCK54-23BX for $23,535 with a cash down payment of $10,000.   ROBERT LEE BURNETT financed $13,535 of the aforementioned purchase through Kubota Credit Corporation. ROBERT LEE BURNETT subsequently made monthly payments including $4,000 in Old Point Cashier's checks paid for with cash, $6,000 paid from Old Point #5006 and $2,500 paid from

ROBERT LEE BURNETT's Langley Federal Credit account # XX4246 towards the Kubota Diesel Tractor described herein, paying off the note on the tractor in February 2015.

54.     The investigative team has identified more than five vehicles owned or operated by ROBERT LEE BURNETT and SHIRLEY DIANE BURNETT between 2014 and 2017 with an estimated total value over $100,000. There are no liens on any of the vehicles. Liens on two of those vehicles were paid in full within a few months of the purchase date.  For example, in February of 2016, ROBERT LEE BURNETT purchased a 2016 Ford F-350 truck from Wynne Ford for approximately $74,000 (VIN: XXXXXXXXXXXXX5840, Virginia Registration: TX143125). He traded in a 2006 Ford F350 for $16,000. At the time of purchase, the title history for the truck identified a lien by Bayport Credit Union, Auto Loan #5545. Within three months, by May of 2016, the loan of $53,810 was paid in full. ROBERT LEE BURNETT paid $4,322 cash, with $2,000 as a down payment and $2,322 cash payment on the loan and then wrote a check from his HELOC #5820 for $49,811 to pay the loan off.  DMV records indicate that the F-350 sold on April 12, 2017, however, as of this date, it has not been retitled anywhere in the United States. The registration expired in February 2017 and it is undetermined if the vehicle was sold, to whom and for how much, and its current location.  In addition, on June 6, 2013, ROBERT LEE BURNETT purchased a 2013 Ford F-150 truck from Wynne Ford for approximately $53,230 (VIN # XXXXXXXXXXXXX3519 and Virginia registration XXX6645). He traded in a 2005 Chevrolet Silverado 1500 for $7,250. At the time of purchase, the title history for the truck identified a lien by Ford Motor Corporation. Within one month, the loan of $53,300 was paid in full. ROBERT LEE BURNETT wrote a check from his Old Point #5006 for $42,871 to pay the loan off.  As of this date, DMV records show that ROBERT LEE BURNETT is still the owner this vehicle.

55.     To date, the investigative team has also identified a number of properties owned by ROBERT LEE BURNETT and/or SHIRLEY DIANE BURNETT, with just three of those properties totaling over $1 million in assessed value.

56.     ROBERT LEE BURNETT and SHIRLEY DIANE BURNETT jointly own XXXXX Batiste Court, Carrollton, Virginia, which they purchased on March 1, 2006 and had a mortgage loan with BB&T. On February 28, 2017, ROBERT LEE BURNETT and SHIRLEY DIANE BURNETT refinanced with Caliber Homes for $336,386 and paid off the remaining estimated $331,000 loan with BB&T. They make the monthly mortgage payments to Caliber from their SunTrust #2602 and have an estimated balance due of $327,409 as of February 28, 2017. In September 2016, ROBERT LEE BURNETT and SHIRLEY DIANE BURNETT obtained a Home Equity Line of Credit account #xx1270 ("HELOC #1270") for approximately $89,000 and as of March 31, 2017, they owe approximately $57,000. As of this date it has not been confirmed how they make payments to HELOC #1270. HELOC #1270 is secured by XXXXX Batiste Court, Carrollton, Virginia.  HELOC #1270 paid off HELOC #5820's balance of $89,594 on September 26, 2016.

57.     ROBERT LEE BURNETT and SHIRLEY DIANE BURNETT also jointly own 107 Seminary Ridge, Hampton, Virginia, which they purchased on July 7, 1988.  There are no liens on this property. In 1998, ROBERT LEE BURNETT and SHIRLEY DIANE BURNETT obtained a Home Equity Line of Credit account #XXX-XXXX-XXXX-XX5820 ("HELOC #5820") for approximately $24,000 and over the years the credit limit increased to $238,000. HELOC #5820 was secured by XXX Seminary Ridge, Hampton, Virginia. As stated above, HELOC #1270 paid off HELOC #5820's balance of $89,594 on September 26, 2016 and the HELOC was closed and satisfied. Advances from HELOC #5820 included: $10,000 in 2011 paid to David Hargett, an $18,000 cash withdrawal for 9Rounds Fitness in 2014, and from December

2014 through April 2015 almost $33,000 in additional checks were written for ProFit business expenses and buildout.   ROBERT LEE BURNETT and SHIRLEY DIANE BURNETT pay down HELOC #5820's account balance from their SunTrust #2602 account.

58.     ALEX JERMAINE BURNETT and his mother, SHIRLEY DIANE BURNETT, jointly own 1705 Sawgrass Lane, Portsmouth, Virginia. SHIRLEY DIANE BURNETT is making the monthly mortgage payments to Fulton Bank NA account # XXXXXX2230 from SunTrust #2602.  When the property was purchased in May 2014, SHIRLEY DIANE BURNETT wrote a $40,979 check from Old Point #5006 as a down payment.

59.     ALEX JERMAINE BURNETT was released from prison in September 2013. In 2012 ROBERT LEE BURNETT and SHIRLEY DIANE BURNETT only deposited $1,250 in cash. However, they began making larger unexplained cash deposits beginning October 2013. ROBERT LEE BURNETT and SHIRLEY DIANE BURNETT deposited over $60,000 in 2014 and almost $54,000 in 2015. Their son, ALEX JERMAINE BURNETT, on the other hand only deposited $1,400.

60.     From the time ALEX JERMAINE BURNETT was released from prison in September 2013, until spring of 2015, there is no indication that he maintained an account at any area bank. Then in April 2015, ALEX JERMAINE BURNETT opened an account with Navy Federal Credit Union, checking account # XXXXXX9879 ("Navy #9879") and savings account #XXXXXX6547 ("Navy #6547") and listed XXXXX Batiste Court, Carrollton, Virginia as his address. ALEX JERMAINE BURNETT listed this address on his bank statements until he stopped using Navy #9879 and Navy #6547 in November 2016. ELEONORA PARONUZZI wrote ALEX JERMAINE BURNETT two $1,500 dollar checks from her Bank of America account # XXXXXXXX4925 ("BoA #4925"), that ALEX JERMAINE BURNETT deposited into his Navy

#9879 and the two checks were returned for irregular signature. ELEONORA PARONUZZI actually had over $21,000 in her bank account at the time she wrote the checks.

61. Analysis of ALEX JERMAINE BURNETT's Navy #9879 and Navy #6547 for 2015, reflects only $9,422 in deposits, primarily payroll from ProFit and $1,426 cash, and his expenditures do not reflect normal monthly expenses such as rent, car payment, groceries, and utilities. This account has not had any activity whatsoever since November 7, 2016, but the account remains open.

62. In November 2016, ALEX JERMAINE BURNETT opened accounts with Wells Fargo, checking account # XXXXXX4405 ("Wells #4405") and savings account # XXXXXXX9665 ("Wells #9665") and listed XXXXX Batiste Court, Carrollton, Virginia as his address on his account. Records indicate he is still using this account. The activity in these accounts, mirror that of Navy #9879 and Navy #6547, with the exception of multiple cash deposits in 2017 totaling over $4,000.

63. On November 12, 2016, ELEONORA PARONUZZI opened accounts with Bank of America, checking account # XXXXXXXXX7326 ("BoA #7326") and savings account #XXXXXXXX7591 ("BoA #7591"). Since opening these accounts in November 2016, ELEONORA PARONUZZI has made over $6,000 in unexplained cash deposits. ELEONORA PARONUZZI also has a checking account with Wells Fargo, which she opened in February 2016, checking account # XXXXX8438 ("Wells #8438"). On July 11, 2017, ELEONORA PARONUZZI made 11 separate unexplained ATM Cash Deposits totaling $4,211. ELEONORA PARONUZZI's income from Diamond International resorts is always via electronic deposit or checks, therefore it is not typical for her to receive cash. ELEONORA PARONUZZI had several other checking and savings accounts where cash was not deposited during the investigative time

period. On June 1, 2016, ELEONORA PARONUZZI purchased XXX Drivers Lane, Newport News, Virginia for $257,900 and obtained a mortgage loan from Wells Fargo. In addition, on June 3, 2017, ELEONORA PARONUZZI purchased XXX Sea Turtle Way, Newport News, Virginia for $327,500 and again obtained a mortgage loan from Wells Fargo.

64.     Some of the ProFit Resultz gym's expenses, such as payroll, are paid from its Old Point #1501. Old Point #1501 receives a substantial portion of its deposits from ClubReady Remit, which is a point of sale system that allows all electronic payments to be transferred to ProFit's Old Point #1501 on a daily basis.  Essentially, when ProFit's customers pay with a debit or credit card, ClubReady Remit captures those payments and remits them to Old Point #1501. In 2014, ALEX JERMAINE BURNETT'S mother, SHIRLEY DIANE BURNETT, paid over $50,000 from her personal bank accounts with Old Point #5006, SunTrust #2602, HELOC #5820, and HELOC #1270 to cover ProFit's expenses. In 2015, SHIRLEY DIANE BURNETT paid $36,180 from personal bank accounts and in 2016 paid $24,227 from her personal bank accounts. To date, SHIRLEY DIANE BURNETT paid over $113,000 from her personal bank accounts with Old Point #5006, SunTrust #2602 and HELOC #5820 and/or HELOC #1270 towards debts of ProFit Resultz, LLC.

65.     ALEX JERMAINE BURNETT's previous girlfriend, ADA RODRIGUEZ, deposited over $71,000 cash from 2014 through 2016 into her Navy Federal Credit Union account #XXXXXXXX50 ("Navy #4050"), but had no W2 employment income. In addition, ADA RODRIGUEZ had over $24,000 of cash deposited to her Navy Federal Credit Union account #7042229307 ("Navy #9307"), which was the bank account for Closet De Estilo. Closet De Estilo is an online boutique sole proprietorship business owned by ADA RODRIGUEZ. The FoA stated that, in their experience, it is highly unusual for an online businesses to accept cash, as they primarily accept payment through electronic means such as PayPal. There were no

PayPal or electronic deposits to the business account #9307 that indicated a purchase had taken place. ADA RODRIGUEZ primarily spent the cash deposited into both accounts on over $26,000 in retail purchases, over $11,000 on travel, $7,366 for various insurances, $4,260 for Verizon, $10,000 for unidentified business rental expenses, almost $3,000 to Sapphire Waters and $500 to Westlake Financial. On May 21, 2014, ADA RODRIGUEZ deposited $6,710 cash into her Navy #4050 account and on the same day wrote check #001 for $6,710 to Casey Cycle City for the purchase of a motorcycle. Also in 2014, ADA RODRIGUEZ paid almost $19,000 cash for a 2004 Hummer utilized by ALEX JERMAINE BURNETT.

66.     The FoA's financial analysis of multiple bank accounts maintained by all of the aforementioned parties indicates that over $300,000 in unexplained cash deposits and cash transactions have occurred between January 2014 and June 2017.

67.     FBI FoA's have concluded the total value of the aforementioned real properties, vehicles, and bank accounts exceed the legitimate income of ROBERT LEE BURNETT and SHIRLEY DIANE BURNETT. In addition, there is sufficient information linking ALEX JERMAINE BURNETT to both XXXXX Batiste Court, Carrollton, Virginia and XXX Drivers Lane, Newport News, Virginia, and that books are being maintained and/or concealed at each residence. This is supported by the fact that all of ALEX JERMAINE BURNETT's ProFit payroll checks, CarMax purchase and loan documents for the 2013 Jeep Grand Cherokee, bank account statements, credit card applications and monthly statements, and Equifax credit reports list XXXXX Batiste Court, Carrollton, Virginia as his mailing address. If ALEX JERMAINE BURNETT's method of delivery for statements and other mailings is "paperless," then the common delivery method is via text or email to a computer system, smartphone or other electronic device capable of telephonic communication, data transfer or connecting to the internet. Due to the risk of endangering members of the investigative team and presence of

surveillance systems at some of the known addresses, the investigative team was unable to repeatedly perform repeated trash covers to obtain evidence of such documents from abandoned property.

68.     It was a further part of the conspiracy for the defendants to open banking accounts and conduct various financial transactions with proceeds from the distribution of cocaine and/or heroin to further facilitate and promote the distribution of cocaine and/or heroin and to conceal and disguise the nature, location, source, ownership, and control of the proceeds of the distribution of cocaine and/or heroin.

69.     It was further a part of the conspiracy for the defendants to use various methods to conceal the conspiracy and their unlawful drug activities, and to ensure the conspiracy's continuing success, including, but not limited to:

a) causing large sums of cash to be deposited into multiple bank accounts to hide the illegal nature of the source of cash;

b) acquiring real estate and supplying false supporting documents to a mortgage lender in order to conceal the illegal nature of the funds used to purchase the said real estate; and

c) purchasing and using a business in order to create the appearance of legitimate income for funds derived from the sale of illegal narcotics.

d)

## **CONCLUSION**

70.     The information contained herein, describes a pattern of drug trafficking and money laundering by ALEX JERMAINE BURNETT; ELEONORA PARONUZZI; ROBERT LEE BURNETT; SHIRLEY DIANE BURNETT; MARIO DEYON BARRETT; CHARLES MCMILLAN; CHARLES BAILEY, JR. and ADA RODRIGUEZ. Based upon the information and evidence set forth above, I respectfully submit that there is probable cause to believe that these individuals have committed, are committing, and will continue to commit all or some of the

offenses involving the distribution and possession with intent to distribute controlled substances in violation of Title 21 United States Code, Sections 841, conspiracy to distribute and possess with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 846, possession of firearm by convicted felon, in violation of Title 18, United States Code, Section 922(g), and conspiracy to commit money laundering in violation of Title 18 United States Code, Sections 1956(h).

71.     Your affiant further believes that there is probable cause that the above listed locations, XXX Drivers Lane, Newport News, Virginia and XXXXX Batiste Court, Carrollton, Virginia and 4321 East Claiborne Square, Hampton, Virginia, contain the items further described in Attachment "B". Therefore, I respectfully request the issuance of search warrants for those locations.

72.     Your affiant further believes that there is probable cause to believe that the 2014 Nissan Altima with VIN # XXXXXXXXXXXXX3322 and Virginia registration XXX1878; 2013 Ford F-150 with VIN # XXXXXXXXXXXXX3519 and Virginia registration XXX6645; 2004 BMW Coupe with VIN # XXXXXXXXXXXXX0064 and Virginia registration XXX6130; and 2004 Porsche Coupe with VIN # XXXXXXXXXXXXX0124 and Virginia registration XXX4105 described herein are subject to seizure and forfeiture as property facilitating drug trafficking.

73.     Your affiant further believes that there is probable cause to believe that the Kubota Diesel Tractor MDL XXXXDLB-R-1 and 54" side discharge mower attachment model XXXXX-23BX and 2016 Ford F-350 with VIN # XXXXXXXXXXXXX5840 and Virginia registration XXXX3125 described herein are subject to seizure and forfeiture as proceeds of drug trafficking.

74.     Your affiant further believes that there is probable cause to believe that the Old Point National Bank account # XXXXXXX5006, SunTrust Bank account # XXXXXXXXXXX2602, Bank of America account # XXXXXXXXX7326, and Wells Fargo account # XXXXXX8438 constitute property involved in concealment money laundering and are therefore subject to seizure

and forfeiture.

75.     With respect to the motor vehicles to be seized, it is the experience of the investigative team that motor vehicles are readily moved, hidden and sold once targets and their associates become aware that the vehicles are subject to forfeiture.  The same is true of the tractor and its attachments, as with mobile pieces of personal property generally.  With respect to the bank accounts to be seized, it is the experience of the investigative team that banks do not always implement restraining orders immediately, allowing the targets and their associates to move funds that should be preserved for forfeiture.  Based on the analysis and investigation thus far it is anticipated that the investigative team will continue to uncover additional evidence of the aforementioned violations moving forward.

FURTHER YOUR AFFIANT SAYETH NOT.

 

_____

Jason Holsinger, Special Agent
Federal Bureau of Investigation

Reviewed by:

_____           _____

Eric M. Hurt                           Kevin Hudson
Assistant United States Attorney        Assistant United States Attorney

Sworn and subscribed to before me
On this 23rd day of October 2017

_____

Robert J. Krask
United States Magistrate Judge
Norfolk, Virginia